UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ROMAN LEE JONES,                                    )
                                                    )
                    Plaintiff,                      )
                                                    )
        v.                                          )        No. 1:16-cv-02887-JMS-MJD
                                                    )
COMMISSIONER, INDIANA DEPARTMENT                    )
OF CORRECTION,                                      )
                                                    )
                    Defendant.                      )

**ORDER**

In 2017, the Court issued a permanent injunction requiring the Indiana Department of

Correction ("IDOC")[1] to, among other things, provide Plaintiff Roman Lee Jones with 8 servings

of kosher or halal meat per week. Dkt. 54. In March 2026, the IDOC transferred Mr. Jones to a

new prison within the State of Indiana, and he did not receive halal meat for a period of time. In

May 2026, the IDOC transferred him to a prison in Illinois, where, he represents, he did not receive

a halal diet at all, let alone a diet including halal meat. Currently before the Court is Mr. Jones's

motion asking the Court to find the IDOC in contempt of the permanent injunction, award him

attorney's fees, and forbid the IDOC from ever transferring him out of Indiana in the future. Dkts.

108, 122, 125, 129.[2] Alternatively, Mr. Jones asks the Court to clarify the permanent injunction to

state that the IDOC may not transfer him away from Indiana because doing so would prevent the

IDOC from complying with its obligation to provide him with a specific diet. Dkt. 129 at 5 n.1. At

---

[1] The defendant in this case is the IDOC Commissioner in his official capacity. Because this case is effectively a suit against the IDOC, for ease of reference, the Court calls the defendant the "IDOC" throughout.

[2] At various points in the briefing, Mr. Jones asked for other relief, but currently he has limited his request to attorney's fees and an order prohibiting the IDOC from transferring him outside the State of Indiana. Dkts. 122, 125, 129.

the telephonic status conference on June 16, 2026, the parties agreed that the Court can resolve the pending contempt motion on the parties' submissions and that no hearing is necessary. Dkt. 124.

For the reasons stated below, the motion is **granted** to the extent that the Court finds the IDOC to be in contempt of the permanent injunction, finds that Mr. Jones is entitled to the reasonable attorney's fees he incurred in litigating his contempt motion, and clarifies the permanent injunction to state explicitly that, if the IDOC transfers Mr. Jones out of Indiana in the future, it must ensure compliance with the terms of the injunction. The motion is otherwise **denied**.

I.    **Facts**[3]

A. **Background**

Mr. Jones initiated this suit in 2016, alleging that the IDOC violated the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, *et seq.* ("RLUIPA"), by refusing to provide him with a halal diet that included meat. *See* dkt. 53. In August 2017, following a bench trial, the Court found that the IDOC violated RLUIPA and issued a permanent injunction requiring as follows:

> The Defendant shall provide the Plaintiff with halal or kosher meals three times a day. At least eight of the twenty-one meals shall contain kosher or halal meat. The Defendant can satisfy this requirement by providing the Plaintiff with the pre-packaged kosher meal tray that currently is provided to inmates who receive kosher meals but who are not at a prison that has a kosher kitchen.

Dkt. 54.

From August 2017 to November 2025, the IDOC complied with the injunction by serving Mr. Jones pre-packaged meals including kosher meat. Dkt. 114-1 ¶ 7. As of November 2025, Mr. Jones was housed at Plainfield Correctional Facility ("Plainfield"), where he was participating in

---

[3] The parties do not disagree on any of the relevant facts.

a pilot program for Level 4 inmates unrelated to his need for kosher or halal meat. *Id.* ¶ 9. During his time at Plainfield, Mr. Jones received pre-packaged meals including kosher meat. *Id.* ¶ 10.

The IDOC determined that Mr. Jones had not adjusted well to the pilot program at Plainfield, meaning that he would be removed from the program. *Id.* ¶ 11. Mr. Jones is a "Level 4" inmate, which means that he is a maximum-security inmate who must be housed in a Level 4 facility due to safety and security concerns. *Id.* ¶ 6. Plainfield is not a Level 4 facility, so ending his involvement in the pilot program meant he had to be transferred away from Plainfield and to a Level 4 facility.

The IDOC decided to transfer Mr. Jones to the Indiana State Prison ("ISP"), and the transfer occurred on March 27, 2026. *Id.* ¶ 11. At the time of the transfer, ISP—like all Level 4 male facilities in Indiana—had an on-site kosher kitchen and served only vegetarian kosher meals. *Id.* ¶ 8. That is, ISP did not serve the pre-packaged kosher meals containing meat that Mr. Jones had been receiving, other than during Passover. *Id.* The record includes no evidence suggesting that the IDOC took any steps before Mr. Jones's transfer to ensure that he would continue receiving kosher or halal meat after his transfer to ISP.

### B. Mr. Jones's Time at ISP

On March 30, 2026, three days after Mr. Jones arrived at ISP, IDOC Director of Religious Services David Liebel sent an email to IDOC staff, including ISP Deputy Warden Dawn Buss, informing them that Mr. Jones had an order to receive at least 8 servings of kosher or halal meat per week, which meant that his diet needed to be supplemented with kosher or halal meat from the commissary. Dkt. 119-1 ¶ 8. He also stated that they "had a little time" because of the upcoming Passover holiday, during which Mr. Jones would receive pre-packaged kosher meals including kosher meat. *Id.* In response, Mr. Liebel was informed that Mr. Jones might be transferred away

3

from ISP because of his disability classification. *Id.* From April 1 to 9, 2026, Mr. Jones (and all other inmates on a kosher diet at ISP) received pre-packaged meals including kosher meat in connection with the Passover holiday. *Id.* ¶ 9. The record includes no evidence suggesting that anyone from the IDOC took further steps to determine how to obtain kosher or halal meat for Mr. Jones at ISP through the commissary until April 20.

In the meantime, though, on April 7, Mr. Liebel contacted IDOC Interstate Corrections Compact Coordinator Joel Gruber and asked for a list of states that have partnered with Indiana for interstate transfers because he was looking for a state that serves kosher or halal diets with meat on a regular basis. Dkt. 114-1 ¶ 16. According to Mr. Liebel, he began exploring transfer to another state as an option because ISP does not prepare kosher or halal meat on site and does not serve prepackaged kosher or halal meals including meat. *Id.* ¶ 13. In addition, the IDOC has discontinued the purchase of prepackaged kosher meals with meat and is switching to a new vendor that provides only vegetarian prepackaged kosher meals. *Id.* That means it would not be possible for Mr. Jones to continue receiving prepackaged kosher meals with meat at ISP. *Id.* Finally, Mr. Liebel suggests in one of his declarations that he believed that supplementing Mr. Jones's diet with halal meat from the commissary was not a long-term sustainable solution, noting that the halal meat options available through the commissary are not designed to be standalone meals and have not been approved by a dietitian as meal substitutes. *Id.*[4]

---

[4] The record includes no evidence as to why Mr. Liebel believed that supplementing Mr. Jones's diet with 8 servings of halal meat per week was not sustainable for the long term. Presumably, if he remained at ISP, Mr. Jones would have continued to receive the vegetarian kosher meals prepared in ISP's kosher kitchen *plus* 8 servings of halal meat from the commissary, so it unclear why it would matter that the halal meat he would get from the commissary was not designed to be a standalone meal and was not certified as a meal substitute. There is also no evidence that anyone asked Mr. Jones if supplementing his diet with 8 servings of halal meat per week from the commissary was acceptable.

4

Mr. Gruber sent Mr. Liebel a list of possible states for transfer the same day (April 7). *Id.* ¶ 17.  As relevant here, Mr. Liebel then emailed his counterpart in Illinois and asked if their halal or kosher meals contain meat and, if so, how frequently. Dkt. 114-3 at 1–2.[5]  In one of his declarations, Mr. Liebel states that his counterpart at the Illinois Department of Corrections "expressed its ability to provide comprehensive kosher and halal meal programs to its offenders, which included four hot chicken meals, four hot beef meals, and one hot fish meal out of the twenty meals served." Dkt. 114-1 ¶ 19. That description is not, however, entirely accurate. Instead, the email response he received read:

> We are in a significant transition on this front across the border in Illinois!
>
> Yes, both contain of these religious diets meat.
>
> We have a patchwork of ways at the moment but are closing in on our target.
>
> See the RFPs attached to see what the public documents show on our plans for meals including the type of proteins.
>
> As this rolls out and is publicly available, I will be able to discuss more details on logistics. Full implementation will be in place before the year ends.

Dkt. 114-3 at 1 (errors in original). Attached to the email was a request for proposals from the Illinois Department of Corrections asking for bids to provide prepackaged kosher and halal meals that would include four hot chicken meals, four hot beef meals, and one hot fish meal out of the twenty meals served per week. Dkt. 114-3 at 3–52.

Based on that response, on April 8, Mr. Liebel asked Mr. Gruber to initiate a transfer for Mr. Jones to the Illinois Department of Corrections.[6] Dkt. 114-2 ¶ 2. The IDOC approved the transfer request to Illinois on April 22 and submitted an Interstate Corrections Compact transfer

---

[5] Mr. Liebel also emailed his counterpart in Colorado, *see* dkt. 114-4, but those facts are not relevant because Mr. Jones was ultimately transferred to Illinois.

[6] As an alternative, Mr. Liebel also suggested Colorado as a possible transfer destination. *See* dkt. 114-1 ¶ 22.

request for Mr. Jones to the Illinois Department of Corrections on April 23. *Id.* ¶¶ 8, 9. The transfer request explicitly stated that Mr. Jones had a court order for dietary restrictions and included a copy of the permanent injunction. *Id.* ¶ 9. On April 30, the Illinois Department of Corrections accepted the transfer request. *Id.* ¶ 10. Mr. Gruber then emailed Mr. Liebel and other IDOC staff communicating that Mr. Jones would be transferred either the week of May 4 or May 11, 2026.

Meanwhile, IDOC staff resumed their efforts to obtain halal meat for Mr. Jones at ISP after Passover ended. On April 15, 2026—six days after Passover ended—Mr. Liebel was informed that Mr. Jones would be staying at ISP and would not be transferred away because of his disability classification. Dkt. 119-1 ¶ 10. Five days later, on April 20, Mr. Liebel contacted the IDOC's Commissary Operations Manager and asked about the process of ordering shelf-stable, certified halal or kosher meat from the commissary for Mr. Jones because there was no established process for IDOC staff to order commissary items for inmates. *Id.* ¶ 11. That same day, Mr. Liebel and Deputy Warden Buss talked about the possibility of ISP ordering halal shredded beef and halal beef sausage for Mr. Jones from the commissary. Dkt. 119-2 ¶ 8. Deputy Warden Buss also communicated with the IDOC's business office about how to place a recurring commissary order for Mr. Jones because there was no established procedure for doing so. *Id.*

On April 27, Deputy Warden Buss learned that an out-of-state transfer request had been submitted for Mr. Jones. *Id.* ¶ 9. On April 30, she asked Mr. Gruber if there were any updates on the transfer request because she was planning to place a commissary order for halal meat for Mr. Jones but did not know how much longer he would be at ISP. *Id.* ¶ 10. She was told that he would likely be transferred the week of May 11, 2026. *Id.*

Deputy Warden Buss placed a commissary order for halal meat for Mr. Jones that same day—Thursday, April 30. *Id.* Generally, commissary orders have to be approved and sent to

Indiana Correctional Industries ("ICI") by Friday, and ISP receives its commissary orders the following Wednesday from ICI. *Id.* The commissary order she placed on April 30 was not processed by the business office in time for it to be delivered the following Wednesday on May 6. *Id.* ¶ 12. As a result, Mr. Jones's commissary order was not delivered until May 13. *Id.* The day the order arrived, Deputy Warden Buss hand-delivered eight packages of halal meat to Mr. Jones. *Id.* ¶ 13.

### C.  Transfer to Illinois and Return to ISP

Two days later—on May 15—Mr. Jones was transferred to the Northern Reception and Classification Center, which is part of the Statesville Correctional Center within the Illinois Department of Corrections. Dkt. 114-1 ¶ 24. After the transfer, Mr. Jones reported to his counsel that he was not receiving a halal diet at all, let alone one with meat. Dkt. 112 at 3; dkt. 116 at 2.[7] Counsel then filed a motion raising the issue with the Court, and the Court ordered a response. Dkts. 112, 113. At that point, on May 22, 2026, Mr. Gruber reached out to his counterparts at the Illinois Department of Corrections about Mr. Jones's claim that he was not receiving a halal diet, and he was told that the inquiry had been relayed to legal staff for review. Dkt. 114-2 ¶ 14. On May 26, 2026, the Illinois Department of Corrections sent Mr. Gruber a letter stating that it had determined that it could no longer house Mr. Jones. Dkt. 117-1.

As discussed at the telephonic status conference on June 16, 2026, Mr. Jones has now been returned to ISP, and the facility is providing him with 8 free servings of halal meat per week from the commissary.

---

[7] Due to the fast-evolving set of facts in this case, Mr. Jones never submitted a declaration stating that he was being denied a halal diet under penalty of perjury, but the IDOC has not disputed that Mr. Jones was denied a halal diet after his transfer to Illinois, nor has it objected to Mr. Jones's reliance on his counsel's reporting of his statements to establish that he did not receive a halal diet in Illinois. Dkt. 116 at 2 n. 1.

## II.   Discussion

Mr. Jones asks the Court to find the IDOC in contempt of the permanent injunction in this case and to impose certain sanctions. Alternatively, he asks the Court to clarify the permanent injunction to state that the IDOC may not transfer Mr. Jones out of state. The Court discusses the three issues separately, in turn.

### A. Contempt

Mr. Jones seeks sanctions for civil contempt.[8] To prevail on a request for a civil contempt finding, a party must establish by clear and convincing evidence that (1) the order in question set forth an unambiguous command; (2) the opposing party violated that command; (3) the violation was significant, meaning that the opposing party did not substantially comply with the order; and (4) the opposing party failed to make a reasonable and diligent effort to comply. *Ohr ex rel. NLRB*, 776 F.3d 469, 474 (7th Cir. 2015). The Court does not "ordinarily have to find that the violation was willful and may find a party in civil contempt if that party has not been reasonably diligent and energetic in attempting to accomplish what was ordered." *Goluba v. School Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995) (cleaned up).

The IDOC does not dispute, nor could it, that the permanent injunction in this case unambiguously required it to provide Mr. Jones with 8 servings of kosher or halal meat per week, that the IDOC violated that command, and that the violation was substantial. *See* dkt. 119 at 3. Instead, the IDOC argues that it should not be held in contempt because it made reasonable and diligent efforts to comply with the permanent injunction after Mr. Jones was transferred to ISP. *Id.* at 3–6. It contends that "[a]dministrative and operational delays were the cause of Plaintiff's

---

[8] Criminal contempt proceedings must follow the procedures outlined in Federal Rule of Criminal Procedure 42 and must afford the accused the constitutional protections afforded in criminal cases. *See* Fed. R. Crim. P. 42; *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826–27 (1994). The Court has not followed the procedures set forth in Rule 42 and will not impose criminal sanctions.

delayed receipt of halal meat from the commissary while he was at the Indiana State Prison" and that the "record shows that IDOC made repeated efforts to provide Plaintiff with halal or kosher meat, despite the uncertainty surrounding his placement at the Indiana State Prison and the unestablished process or procedures of IDOC staff ordering commissary for offenders." *Id.* at 5.

The Court disagrees and concludes that Mr. Jones has shown by clear and convincing evidence that the IDOC was not reasonably diligent in attempting to comply with the permanent injunction. Officials at the IDOC knew that Mr. Jones had a court order requiring that he receive 8 servings of kosher or halal meat per week, and they knew that he was being transferred to a prison that was currently incapable of complying with that requirement. Despite that, they took no steps to begin the process of arranging for him to receive kosher or halal meat before his transfer. The first step they took occurred three days after his transfer, on Monday, March 30. At that point, Mr. Liebel knew that the IDOC needed to arrange for Mr. Jones to receive kosher or halal meat from the commissary and that there was no set process for doing so, but he told staff that they had a "little time" because Passover started the next day and Mr. Jones would be receiving kosher meat every day until April 8. That was not reasonable. The IDOC's own evidence shows that commissary orders must be made by Friday to ensure delivery by the following Wednesday. So, for Mr. Jones to have halal meat from the commissary by the end of Passover, the IDOC would have needed to make a commissary order by that Friday, April 5. Yet no one took any further steps to set the commissary process in motion until a week after Passover ended, on April 15.

The IDOC suggests that the delay was caused by doubt about whether Mr. Jones would remain at ISP or be transferred because of his disability classification. Any such delay was not reasonable. Again, the IDOC's own evidence shows that Mr. Jones could only be housed at a Level 4 facility and that none of the Level 4 facilities in Indiana could comply with the injunction from

9

this case under their regular operating procedures. That is, even if Mr. Jones were transferred to another Level 4 prison in Indiana, arrangements would have to be made for him to receive halal meat, and halting the process until it was clear that he would remain at ISP was not reasonable. This conclusion alone is enough to warrant a contempt finding.

In its response to the contempt motion, the IDOC also does not contest Mr. Jones' representation that he did not receive a halal diet at all once he made it to Illinois, let alone one with 8 servings of halal meat per week. In responding to the now-moot motion that Mr. Jones filed after his counsel learned he had been transferred to Illinois, the IDOC contends that it asked to have Mr. Jones transferred to Illinois because Mr. Liebel had confirmed that Illinois "offered comprehensive halal and kosher meals with meat on a routine basis." Dkt. 115 at 4. But that argument mischaracterizes the evidence. Mr. Liebel's counterpart in Illinois did not, as Mr. Liebel states in his declaration, "express[] its ability to provide comprehensive kosher and halal meal programs to its offenders, which included four hot chicken meals, four hot beef meals, and one hot fish meal out of the twenty meals served." Dkt. 114-1 ¶ 19. Instead, he told Mr. Liebel that Illinois was "in significant transition," was "closing in on our target," and that "full implementation" of the new system would "be in place before the year ends." Dkt. 114-3 at 1.

It was not reasonable for the IDOC to interpret that email to mean that Mr. Jones would be assured of receiving 8 servings of halal meat per week once he arrived in Illinois. At a bare minimum, a reasonably diligent attempt to comply with the permanent injunction would have required Mr. Liebel to follow up with his counterpart in Illinois to confirm that Illinois would be able to comply with the permanent injunction in this case once Mr. Jones arrived there.

In summary, Mr. Jones has established by clear and convincing evidence that the IDOC was not reasonably diligent in attempting to comply with the permanent injunction in this case.

The Court is not suggesting that reasonably diligent compliance would have required the IDOC to ensure that Mr. Jones begin receiving 8 servings of halal meat per week immediately upon his arrival at ISP. The Court understands that administrative and operational requirements can sometimes cause delays. But, taken together, the pattern of delays in this case compels a conclusion that the IDOC was not reasonably diligent in attempting to comply with the permanent injunction in this case once it became clear that Mr. Jones would be transferred away from Plainfield.

### B. Sanctions

The Court now considers what sanctions are appropriate. Mr. Jones asks the Court to award him the reasonable attorney's fees he incurred in connection with his contempt motion and to order the IDOC never to transfer him outside of Indiana again. Dkt. 109 at 6; dkt. 129. The IDOC does not dispute that attorney's fees are potentially an appropriate sanction in this case. Dkts. 119, 126. It contends, however, that ordering it never to transfer Mr. Jones outside Indiana is a criminal sanction that cannot be properly imposed in this civil contempt proceeding. Dkt. 126.

Contempt sanctions come in two forms—criminal and civil. *FTC v. Trudeau*, 579 F.3d 754, 769 (7th Cir. 2009). The distinction matters because imposing criminal contempt sanctions requires certain constitutional safeguards that have not been met in this case. *Id.* The difference between a civil contempt sanction and a criminal contempt sanction "depends on the character of the relief itself, and not on the subjective intent of" the court imposing the sanction. *Id.* (cleaned up). The line between civil and criminal contempt sanctions is not always clear. *Id.* Generally, however, "civil contempt is remedial, and for the benefit of the complainant, while criminal contempt is punitive, to vindicate the authority of the court." *Id.* (cleaned up). There are two types of civil contempt sanctions. First, civil contempt sanctions may be remedial, such as an order to compensate the moving party for losses caused by the contemptuous conduct. *Id.* at 769. Second,

11

"sanctions . . . designed to compel future compliance with a court order, are considered to be coercive and available through obedience, and thus may be imposed in an ordinary civil proceeding." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994). An "essential ingredient to any coercive contempt sanction is the opportunity to purge," and a "'purgeable' sanction is one that allows the contemnor to free himself of the sanction by committing an affirmative act, namely complying with the court's order." *Trudeau*, 579 F.3d at 777 (cleaned up).

The Court finds that Mr. Jones is entitled to an award of the reasonable attorney's fees he incurred in bringing the IDOC's contempt to the Court's attention. *See In re Sterling*, 140 F.4th 924, 929 (7th Cir. 2025) (explaining that the court has broad discretion to shift attorney's fees as a contempt sanction).[9] Thus, the Court will allow him to file a fee petition after conferring with the IDOC to determine if the parties can agree on a fee award without further Court involvement.

It concludes, however, that Mr. Jones's request for an order prohibiting the IDOC from transferring him out of the State of Indiana is not a proper civil contempt remedy because it is not purgeable. In *FTC v. Trudeau*, the court entered an order prohibiting the defendant from advertising any products in informercials. 579 F.3d at 757. The order contained an exception whereby the defendant could participate in infomercials for publications, including his own, as long as the publication did not refer to any other product he was marketing and did not misrepresent the content of the publication. *Id.* at 757–58. The defendant violated the order by making an infomercial that misrepresented the content of a book he wrote. *Id.* at 760–61. The district court found him in civil contempt and sanctioned him by, among other things, banning him from making

---

[9] As explained, the IDOC does not dispute that an award of reasonable attorney's fees is a proper compensatory sanction in a civil contempt case or offer any argument why such an award would be improper in this case beyond its general argument that it is not in contempt of the permanent injunction.

infomercials for three years. *Id.* at 762. The district court stated that, given the defendant's prior willingness to flout court orders, only a ban would achieve compliance and protect consumers. *Id.* The Seventh Circuit held that the informercial ban was not compensatory and was not a proper coercive sanction, either. *Id.* at 777. The court explained:

> A coercive sanction seeks to bring the contemnor's conduct into compliance with the court's order. In this broad sense, the infomercial ban appears to "coerce" compliance with the 2004 Consent Order prohibiting Trudeau from misrepresenting the content of his books. Trudeau can't produce or participate in deceptive infomercials if he can't produce or participate in any infomercials at all. However, the Supreme Court has made clear that an essential ingredient to any coercive contempt sanction is the opportunity to purge. A purgeable sanction is one that allows the contemnor to free himself of the sanction by committing an affirmative act, namely complying with the court's order . . . . Even imprisonment can be considered coercive, and thus not criminal, if the contemnor can obtain his release through compliance. But to the extent that a sanction operates whether or not a party remains in violation of the court order, it obviously does not coerce any compliance.
>
> The trouble with the infomercial ban is that it lasts for three years  no matter what Trudeau does. Trudeau could take all the steps in the world to convince the FTC and the district court that he will be truthful in his next infomercial, but even if he offers to read his book word-for-word and say nothing else, he cannot free himself from the court's sanction. Rather, the three-year ban is like a prison term of a definite, pre-determined length without the contemnors ability to purge, which we have held is generally considered punitive and therefore not a proper coercive contempt sanction.

*Id.* at 777–78 (cleaned up). The Court concludes that, like the informercial ban in *Trudeau*, Mr. Jones's proposed "no out-of-state transfer" sanction is improper in a civil contempt proceeding because it cannot be purged.

Mr. Jones attempts to distinguish *Trudeau*, arguing:

> [O]nce Mr. Jones was removed [from Indiana to Illinois], the Commissioner lost all ability to ensure that this Court's Judgment was complied with, and this Court lost all ability to compel compliance as the Illinois Department of Corrections is not a party to this case . . . . The contrast [with *Trudeau*] is clear. The Court's Judgment requires that the Commissioner provide the kosher or halal diet with meat. If he is sanctioned by ordering that he not surrender Mr. Jones to another jurisdiction where he loses control over Mr. Jones and is unable to ensure that he receives the required diet, the sanction  will apply only if the Commissioner would otherwise be in noncompliance  with  the  order.  By  committing  the  "affirmative  act"  of  not

13

transferring Mr. Jones out of Indiana, the Commissioner will avoid the contempt sanction. In *Trudeau*, the sanction applied even if the defendant did not violate the underlying judgment. Here, the sanction applies only if the Commissioner were to attempt to violate the judgment. The sanction remains only until the contemnor complies with the court order. That is, the Commissioner may free himself of the sanction by complying with this Court's Judgment.

Dkt. 120 at 3–4 (cleaned up).

The Court disagrees. As in *Trudeau*, no matter what steps the IDOC takes to ensure that Mr. Jones receives kosher or halal meat in compliance with the permanent injunction, it will not be able to purge itself of the "no out-of-state transfer" sanction and will not be able to transfer Mr. Jones out of Indiana. Mr. Jones's argument assumes that simply transferring Mr. Jones out of Indiana would amount to a violation of the permanent injunction because the IDOC would no longer be directly providing Mr. Jones with kosher or halal meat, the IDOC would no longer be able to ensure compliance with the permanent injunction, and the Court would not be able to compel compliance with the injunction because the Illinois Department of Corrections is not a party to the case. But that is not necessarily the case. The permanent injunction does not necessarily require the IDOC to provide a compliant diet to Mr. Jones directly. Instead, the IDOC is under a permanent obligation to ensure that Mr. Jones receives 8 servings of halal or kosher meat per week as long as he is in IDOC custody, whether it provides that meat to Mr. Jones directly or not. The fact that the IDOC might transfer Mr. Jones to a prison in another state does not relieve it of its obligation to ensure that he receive halal and kosher meat in compliance with the permanent injunction. Nor does it mean that the Court would lose the ability to enforce compliance with the permanent injunction. The Court might not be able to issue coercive orders against the state to which Mr. Jones was transferred, but that does not make it powerless to enforce the injunction. For example, if Mr. Jones had remained in Illinois and was not receiving a compliant diet, the Court could have entered coercive sanctions against the IDOC—such as ordering the IDOC to pay a

14

daily fine until it ensured that Mr. Jones was receiving a proper diet or returning Mr. Jones to Indiana.

As Mr. Jones's failed transfer to Illinois shows, this means that, any time the IDOC transfers Mr. Jones out of Indiana, it takes an enormous risk because it may be found to be in contempt of the permanent injunction if the other state fails to give Mr. Jones 8 servings of halal or kosher meat per week. But it is not inevitable that a transfer out of Indiana would result in a violation of the permanent injunction. For example, if the Illinois Department of Corrections had immediately begun serving Mr. Jones the required amount of halal or kosher meat and continued to do so without interruption, then the transfer to Illinois would not have caused a violation of the permanent injunction.

So framed, Mr. Jones's proposed "no out-of-state transfer" sanction is analogous to the informercial ban in *Trudeau*: No matter what the IDOC does to ensure that Mr. Jones continues receiving 8 servings of halal or kosher meat per week, it would not be able to purge itself of the sanction. Thus, it is not a proper coercive sanction in this civil contempt.

Moreover, even if the "no out-of-state transfer" sanction were potentially appropriate, the Court would decline to impose such a sanction at this time. Mr. Jones is currently 53 years old, and the IDOC lists his earliest possible release date as December 5, 2103.[10] That is, he may be in IDOC custody for decades. It is possible that, in the future, the IDOC may need to transfer Mr. Jones out of state for legitimate reasons unrelated to his religious diet, and the Court will not artificially limit its ability to do so by prohibiting it from transferring Mr. Jones out of state at this time.

---

[10] *See* https://offenderlocator.idoc.in.gov/idoc-ofs-1.0.2/ofs (last visited Aug. 6, 2026).

### C. Clarifying the Injunction

As an alternative to the "no out-of-state transfer" sanction, Mr. Jones suggests that the Court could clarify the permanent injunction to state that the IDOC may not transfer Mr. Jones outside of Indiana. Dkt. 129 at 5 n.2. The Court declines to make that clarification because, as explained above, the injunction does not necessarily prohibit the IDOC from moving Mr. Jones out of state.

Because the IDOC's attempt at transferring Mr. Jones to Illinois has raised an issue possibly unforeseen at the time the injunction was entered, the Court will, however, clarify the permanent injunction[11] and explicitly state as follows: Under the terms of the permanent injunction, the IDOC bears the ultimate responsibility for ensuring that Mr. Jones is provided with a diet that complies with the terms of the permanent injunction, whether it does so directly or not. That remains true even if the IDOC decides to transfer Mr. Jones to a prison outside of Indiana. Put another way, if the IDOC transfers Mr. Jones to another state, it must ensure that the receiving state complies with the permanent injunction or face the possibility of again being held in contempt. Given the risks associated with transferring Mr. Jones out of state, it appears that the easiest way for the IDOC to comply with the permanent injunction is to continue doing what it is currently doing—providing Mr. Jones with a vegetarian kosher diet and also providing him with 8 supplemental servings of halal meat from the commissary each week.

---

[11] The Court does not believe that the permanent injunction needs clarification on this point. Notably, the IDOC took some steps (albeit inadequate) to try to ensure that the Illinois Department of Corrections would provide Mr. Jones with 8 servings of halal or kosher meat per week, as required by the permanent injunction. This suggests that the IDOC has always known that it remains responsible for ensuring that Mr. Jones receives a diet consistent with the permanent injunction even if it moves him to another state. Nonetheless, because there may be some confusion on the IDOC's part as to whether the permanent injunction allows it to transfer Mr. Jones outside Indiana and, if so, under what circumstances, the Court will now make explicit what was implicit in the permanent injunction. *See In re Hendrix*, 986 F.2d 195, 200 (7th Cir. 1993) ("[A] person subject to an inunction always has the right to ask the court that it is administering it whether it applies to conduct in which the person proposes to engage . . . . [H]ere . . . the bankruptcy court was free to clarifying the inexplicit . . . injunction.").

### III.    Conclusion

In summary, Mr. Jones's motion asking the Court to hold the IDOC in contempt of the permanent injunction and enter sanctions, dkt. [108], is **granted** to the extent that the Court finds the IDOC to be in contempt of the permanent injunction, awards Mr. Jones the reasonable attorney's fees he incurred in bringing and litigating his contempt motion, and has clarified the terms of the permanent injunction. Mr. Jones's may file a fee petition within **30 days of the date of this Order**. The petition must be supported by appropriate documentation. Before filing the motion, Mr. Jones's counsel must confer with the IDOC's counsel to determine if the parties can agree on a fee award, such that Mr. Jones may file an unopposed fee petition. Mr. Jones's contempt motion is **denied** to the extent it seeks any other relief.

**IT IS SO ORDERED.**

Date: 8/7/2026

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

Amanda Clark
Office of Indiana Attorney General
amanda.clark@atg.in.gov

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Katherine A Meltzer
Office of Indiana Attorney General
katherine.meltzer@atg.in.gov